# Illinois Official Reports

## Appellate Court

---

### *People v. Won Kyu Lee*, 2014 IL App (1st) 130507

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. WON KYU LEE, Defendant-Appellee. |
| District & No. | First District, Fifth Division<br>Docket No. 1-13-0507 |
| Filed | March 14, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | A trial court properly granted defendant's motion to suppress the evidence obtained by way of a warrantless audit of his offices conducted as part of an investigation of his Medicare billing procedures by a company hired by a government agency to investigate allegations of fraud, waste, and abuse in Medicare programs, since the trial court's finding that the audit was a pretext for obtaining documents to further the criminal investigation of defendant's business and that a search warrant should have been obtained was not against the manifest weight of the evidence, especially when the record did not support the State's claim that defendant consented to the audit, and the Medicare statute providing for payment audits under the Medicare Integrity Program did not authorize a blanket consent for a search into criminal wrongdoing. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CR-14147; the Hon. Charles P. Burns, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Michael M. Glick and Stephen M. Soltanzadeh, Assistant Attorneys General, of counsel), for the People. |
|---|---|
| | Jeffery P. Gray, of Warrenville, and Johanna J. Raimond, of Law Offices of Johanna J. Raimond Ltd., of Chicago, for appellee. |
| Panel | JUSTICE McBRIDE delivered the judgment of the court, with opinion. Justices Palmer and Taylor concurred in the judgment and opinion. |

**OPINION**

¶ 1    Following a hearing, the trial court granted defendant Won Kyu Lee's motion to suppress evidence obtained pursuant to a warrantless search. The State appeals, arguing that the trial court erred in suppressing evidence from the administrative search of defendant's offices because defendant (1) expressly consented to the search and (2) consented to the search by entering into a contract with Medicare. The State also asserted in its opening brief that the search was valid under the administrative search exception to the fourth amendment set forth in *New York v. Burger*, 482 U.S. 691, 703 (1987). However, in its reply brief, the State indicated in a footnote that "the People no longer contend that it applies on this record." Accordingly, we will not consider that issue in this appeal.

¶ 2    In August 2011, defendant was charged by indictment with theft by deception, aggravated insurance fraud, computer fraud, and wire fraud. The charges stemmed from an investigation into defendant's Medicare billing at his business, Hankook Pain and Rehabilitation Clinic (Hankook).

¶ 3    In June 2012, defendant filed a motion to suppress evidence obtained in a May 2007 audit of Hankook's two locations, Chicago and Mount Prospect. Defendant argued that the audit violated the fourth amendment because it was conducted without a warrant and with the purpose of aiding an ongoing criminal investigation. The trial court conducted a hearing on defendant's motion in November 2012. The following evidence was presented at the hearing.

¶ 4    In August 2006, the Office of the Inspector General (OIG) of the Department of Health and Human Services (DHHS) referred a complaint about defendant to TrustSolutions "as a law enforcement request, for investigation and development." The referral stated that the OIG expected the matter to proceed "as a Law Enforcement referral and request for action."

¶ 5    Daniel Poirier testified that he worked as an investigator with TrustSolutions. He explained that TrustSolutions was contracted by the Center for Medicare and Medicaid Services (CMS) to investigate allegations of fraud, waste, and abuse in Medicare programs. Poirier was assigned to investigate Hankook.

¶ 6    He stated that when the complaint was received, TrustSolutions requested background information and conducted a claims analysis of billing information. Based on the information received, the next step was an on-site audit of records for medical review. In December 2006, Poirier made initial contact with Special Agent Chuck Pawelko of the Federal Bureau of Investigation (FBI). In an exhibit outlining his activity in the Hankook investigation, Poirier indicated Pawelko "requested copies of all data and research that [he] had previously conducted and analyzed." Pawelko also "requested that no contact be made to this provider (by telephone or in person)." Also in December 2006, the FBI, in a letter, asked TrustSolutions to delay an on-site audit to allow them "to explore possible covert investigation measures. We believe that our investigation will be more fruitful if Hankook is unaware of any type of investigation at this time."

¶ 7    In the interim, Poirier had frequent conversations with the FBI, including conference calls and sharing research. In January 2007, Poirier "conducted further research to find the necessary documentation related to each issue [law enforcement] inquired about." He reviewed data requests with Pawelko. In February 2007, a "conference call was held to discuss law enforcement's request for TrustSolutions to 'hold off' on this investigation." In March 2007, Poirier participated in another conference call to discuss law enforcement's status. At that time, law enforcement requested three more weeks because "they were in the final stages of their undercover operations and did not want the investigation jeopardized."

¶ 8    In April 2007, Poirier requested permission to conduct an unannounced on-site audit of Hankook offices. The request form stated that the objective was "[t]o further substantiate the allegations against this provider and to witness firsthand the daily operations in both facilities. Ultimately, this investigation will be referred to law enforcement based on all evidence gathered on the audit." Poirier testified that after the audit request was approved, law enforcement requested that undercover law enforcement agents accompany TrustSolutions during the audit. The request was approved by CMS, but an assistant United States Attorney (AUSA) denied the request. The FBI did provide a Korean translator during the audit to help conduct interviews and read some documents.

¶ 9    The on-site audit was conducted from May 7-11, 2007. On May 7, 2007, TrustSolutions investigators arrived unannounced at both Hankook locations. Poirier was with the team at the Chicago office. The investigators presented Medicare badges and a letter stating the purpose of the audit. Defendant was not present at the Chicago office, but was at the Mount Prospect location. Poirier spoke with Janice Roe, the office manager, and gave her the letter.

¶ 10    The letter stated that TrustSolutions was "responsible for conducting audits to ensure that Medicare claims have been billed and paid in the appropriate manner. Per 42 CFR § 424.5(a)(6) a basic condition for Medicare payment, the provider must furnish sufficient information to justify payment." The letter provided that "[t]he audit will include at least but not limited to obtaining medical records, interviewing staff, etc." The letter explained that the records to be obtained were a statistically random sample consisting of 273 beneficiary files.

¶ 11    Poirier admitted that the letter did not indicate that a provider could refuse to furnish the requested information. When asked if he explained that the employees could refuse access, Poirier responded, "No one asked so I didn't volunteer a question that wasn't posed." Poirier spoke with defendant over the phone. Poirier testified that defendant "gave authorization to conduct the on-site audit and we performed the audit." Poirier stated that he "notified

[defendant] of what the on-site audit would entail, provided that [Poirier] had indicated the letter to Janice Roe and [defendant] said okay."

¶ 12    During the five-day audit, Poirier updated law enforcement each day. Poirier stated that to the best of his knowledge the conversations were "just information, updates, how the audit is going." He said law enforcement "never" requested the auditors to look for anything. The teams obtained 273 medical records, appointment books, payroll records, employment and personnel records. Poirier admitted that the auditors were given access to any records they requested. At the conclusion of the audit, Poirier said that TrustSolutions turned over the documents obtained to law enforcement and he discussed his findings with Pawelko. Pawelko requested certain documents for the assigned AUSA "prior to issuing a search warrant."

¶ 13    Richard Ganslein testified that he was the TrustSolutions investigator that led the team at the Mount Prospect office. Defendant was present at that location. Ganslein stated that the team introduced themselves, presented their badges, and provided defendant with the letter explaining what TrustSolutions was and its responsibilities. They answered general questions about TrustSolutions. Ganslein did not ask defendant to sign a consent form to enter the premises and conduct the audit. When asked if defendant consented, Ganslein answered, "He never voiced any objection. He facilitated the audit, yes." Ganslein said defendant facilitated by providing a workspace for himself and for the employees available for interviews.

¶ 14    The trial court heard arguments and allowed the parties to file briefs after the hearing. In January 2013, the trial court granted the motion to suppress in a written order. The court found that "any consent authorized is unclear."

> "Moreover, in any event, if consent was authorized merely based on the Medicare statute asserted, it was clear from the evidence presented that the search far exceeded the general audit search for purposes of determining pre-pay review."

¶ 15    Further, the trial court found "defendant's argument that the administrative audit was a pretext to gather evidence for a criminal investigation meritorious." "The totality of the circumstances indicates that TrustSolutions acted in concert and at the behest of the FBI and OIG and were acting as agents and at direction of law enforcement. To say otherwise would be disingenuous." The court detailed several facts that supported the presence of a criminal pretext, including law enforcement was in the process of an investigation when TrustSolutions was contacted, there were numerous conference calls and memos between TrustSolutions and the FBI, OIG, and CMS, TrustSolutions complied with law enforcement's requests to delay the on-site audit, and TrustSolutions briefed law enforcement daily with its audit findings and progress.

> "All evidence points to a tightly interwoven relationship between the FBI, OIG and TrustSolutions. Law enforcement clearly called the shots in this matter and TrustSolutions abided by each and every request made by law enforcement, including when to put defendant on pre-pay status, which allegedly was TrustSolutions['] main purpose of the audit."

¶ 16    While not binding, the trial court also noted that the United States Attorney's office declined prosecution, "as the AUSA handling the matter apparently recognized the intertwined relationship between law enforcement and TrustSolutions prior to and during the audit." The court granted defendant's motion to suppress and "[a]ll evidence obtained during the search

will thus be excluded as violative of the 4th Amendment to the United States Constitution and article 1 § 6 of the Illinois Constitution."

¶ 17   This appeal followed.

¶ 18   The State argues that the trial court erred in granting defendant's motion to suppress because the audit did not have a criminal pretext and defendant consented to the audit.

¶ 19   In reviewing a trial court's ruling on a motion to suppress, this court applies a *de novo* standard of review. *People v. Sorenson*, 196 Ill. 2d 425, 431 (2001); see also *Ornelas v. United States*, 517 U.S. 690, 699 (1996). However, findings of historical fact will be reviewed only for clear error and the reviewing court must give due weight to inferences drawn from those facts by the fact finder. *Ornelas*, 517 U.S. at 699. Accordingly, we will accord great deference to the trial court's factual findings, and we will reverse those findings only if they are against the manifest weight of the evidence; however, we will review *de novo* the ultimate question of the defendant's legal challenge to the denial of his motion to suppress. *Sorenson*, 196 Ill. 2d at 431.

¶ 20   The fourth amendment to the United States Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. The Supreme Court has held that "[s]earches for administrative purposes, like searches for evidence of crime, are encompassed by the Fourth Amendment." *Michigan v. Tyler*, 436 U.S. 499, 506 (1978). Further, the Supreme Court has ruled that warrantless searches of commercial premises are generally unreasonable. *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312 (1978); see also *Michigan v. Clifford*, 464 U.S. 287, 291 (1984); *Tyler*, 436 U.S. at 504-08. "This expectation [of privacy in commercial property] exists not only with respect to traditional police searches conducted for the gathering of criminal evidence but also with respect to administrative inspections designed to enforce regulatory statutes." *New York v. Burger*, 482 U.S. 691, 699-700 (1987).

> "[T]he Fourth Amendment prohibition against unreasonable searches protects against warrantless intrusions during civil as well as criminal investigations. [Citation.] The reason is found in the 'basic purpose of this Amendment ... [which] is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials.' [Citation.] If the government intrudes on a person's property, the privacy interest suffers whether the government's motivation is to investigate violations of criminal laws or breaches of other statutory or regulatory standards." *Marshall*, 436 U.S. at 312-13 (quoting *Camara v. Municipal Court*, 387 U.S. 523, 528 (1967)).

¶ 21   "Except in certain carefully defined classes of cases, the nonconsensual entry and search of property are governed by the warrant requirement of the Fourth and Fourteenth Amendments." *Clifford*, 464 U.S. at 291-92. "In the law of administrative searches, one principle emerges with unusual clarity and unanimous acceptance: the government may not use an administrative inspection scheme to search for criminal violations." *Burger*, 482 U.S. at 724 (citing *Clifford*, 464 U.S. at 292, *Tyler*, 436 U.S. at 508, *Donovan v. Dewey*, 452 U.S. 594 (1981), *Almeida-Sanchez v. United States*, 413 U.S. 266 (1973), *Camara*, 387 U.S. at 539, and *Abel v. United States*, 362 U.S. 217 (1960)). "If the primary object of the search is to gather evidence of criminal activity, a criminal search warrant may be obtained only on a showing of probable cause to believe that relevant evidence will be found in the place to be searched. If evidence of criminal activity is discovered during the course of a valid administrative search, it may be seized under the 'plain view' doctrine." *Clifford*, 464 U.S. at 294. "Whether an administrative

search is a pretext for a criminal investigation is a factual question." *United States v. Johnson*, 994 F.2d 740, 743 (10th Cir. 1993) (citing *Abel*, 362 U.S. at 225-30).

¶ 22   It is undisputed in this case that the on-site audit of defendant's businesses by TrustSolutions was conducted without a warrant. Moreover, the State has conceded in its reply brief that the administrative search exception for warrantless searches when a statute's inspection program provides sufficient substitute for a warrant does not apply in this case.

¶ 23   The evidence in the record clearly established that the TrustSolutions auditors were aware of law enforcement's intention to pursue criminal charges against defendant. The initial referral to TrustSolutions indicated that it was forwarded from the OIG "as a law enforcement request, for investigation and development." Poirier testified that he was aware that the FBI and OIG were in the process of a criminal investigation of defendant and his offices. He participated in numerous conversations with the FBI about the case. TrustSolutions also yielded to the FBI's requests to delay conducting an on-site audit while it was investigating defendant. TrustSolutions and CMS approved the FBI's request to have its agents present at the audit, but the request was later denied by the AUSA. During the course of the audit, Poirier briefed law enforcement every day regarding his findings and progress. TrustSolutions gave law enforcement all requested documents obtained in the audit.

¶ 24   As the trial court found, "[a]ll evidence points to a tightly interwoven relationship between the FBI, OIG and TrustSolutions." From the very inception of TrustSolutions' involvement, the presence and influence of law enforcement controlled the investigation. Significantly, Poirier's request for an on-site audit stated that the objective was "[t]o further substantiate the allegations against this provider and to witness firsthand the daily operations in both facilities. Ultimately, this investigation will be referred to law enforcement based on all evidence gathered on the audit." This objective illustrates the clear purpose of the audit was to aid law enforcement.

¶ 25   Further, the letter provided to Hankook offices explaining the audit indicated that TrustSolutions was investigating whether "Medicare claims have been billed and paid in the appropriate manner" and that the audit would include, but was not limited to, obtaining a random sample of medical records and interviewing staff. However, Poirier testified that in addition to the medical records, auditors obtained copies of personnel files, payroll records, and appointment books. These documents have little connection to the stated purpose of investigating Medicare billing practices. The record supports the trial court's conclusion that the audit served as a pretext for a criminal search.

¶ 26   The State asserts that "mere communication between investigators conducting an administrative search and law enforcement agents does not render an administrative search pretextual." However, as detailed above, the record contains far more than "mere communication" between TrustSolutions and the FBI and the OIG. The State also argues that an administrative search is not invalid "so long as its *primary* purpose is to enforce the regulatory scheme" and "nothing in the record supports a finding that the *primary* purpose of the investigation was to assist those agencies' criminal investigations or otherwise uncover evidence of criminal activity." (Emphases in original.) The State fails to cite any authority in which an administrative search was found to be valid because the involvement of law enforcement was not the primary purpose of the investigation. The cases cited, *Burger* and *People v. Krull*, 126 Ill. 2d 235 (1989), involved administrative searches of junkyards under

statutory authority and did not consider whether the primary purpose of the searches involved law enforcement. See *Burger*, 482 U.S. at 716; *Krull*, 126 Ill. 2d at 247.

¶ 27        Additionally, the reviewing court in *People v. Prolerized Chicago Corp.*, 225 Ill. App. 3d 307 (1992), previously considered and rejected this argument. In that case, the defendants were indicted for failure to maintain proper records for a scrap processor licensed under the Illinois Vehicle Code (Code) (Ill. Rev. Stat. 1989, ch. 95½, ¶ 5-404). The trial court granted the defendants' motion to suppress evidence, finding that the law enforcement officials should have obtained a search warrant. *Prolerized*, 225 Ill. App. 3d at 308-09.

¶ 28        "The record indicates that on March 30, 1988, several Chicago police officers, along with inspectors employed by the Illinois Secretary of State, entered the premises of Prolerized, a scrap processor, and conducted an inspection of the corporation's books and records." *Id.* at 309. At the hearing on the defendants' motion, a police officer testified that "his purpose in going to Prolerized was to conduct an inspection of the records which Prolerized was required to keep pursuant to section 5-403 of the Code. (Ill. Rev. Stat. 1987, ch. 95½, par. 5-403.)" *Id.* at 310. The officer stated that he was unaware of any criminal investigation. *Id.* Another officer testified that beginning in January 1988, he had begun stopping tow truck drivers in the vicinity of Prolerized's location. *Id.* at 311. After the hearing, the trial court granted the motion to suppress, finding "that the police department had initiated a criminal investigation of the business practices of Prolerized prior to the inspection on March 30, 1988." *Id.* at 312.

¶ 29        On appeal, the reviewing court concluded that the case was controlled by *People v. Madison*, 121 Ill. 2d 195 (1988), *overruled on other grounds by Horton v. California*, 496 U.S. 128 (1990), in which the supreme court held the statute at issue "was enacted to protect against the possible abuses of administrative searches by requiring that the neutral judgment of a magistrate or judge be obtained before allowing State officials to seize evidence of criminal activity discovered during inspections." *Prolerized*, 225 Ill. App. 3d at 314 (citing *Madison*, 121 Ill. 2d at 205).

¶ 30        The State, as it does in the instant case, attempted to distinguish *Madison*, "focus[ing] upon the language in *Madison* where the court held that administrative inspections may not be used as a pretext to search for evidence of criminal violations and that if the primary object of the search is to gather evidence of criminal activity a search warrant based upon probable cause must be obtained." *Id.* at 315 (citing *Madison*, 121 Ill. 2d at 209-10). The reviewing court disagreed, finding:

> "The evidence in the record established that the law enforcement officials who participated in the administrative inspection knew or suspected that Prolerized was in the practice of purchasing vehicles without accepting titles or other ownership documents for the vehicles. This evidence indicates that the purpose of the inspection of Prolerized was not merely to review the corporation's business records. The trial court specifically found that a criminal investigation of Prolerized had begun prior to the inspection on March 30, 1988. Based upon this record, the trial court could properly conclude that the administrative inspection was merely a subterfuge allowing the police to enter the defendants' premises with the expectation that they would find evidence of illegal activities." *Id.*

¶ 31        Similarly, the reviewing court in *People v. Nash*, 278 Ill. App. 3d 157, 162 (1996), concluded that "[t]he routine administrative search evolves into an unreasonable usurpation of the [defendant's] privacy interests when it is used as a tool to further a criminal investigation

- 7 -

where evidence of criminal activity is already present." In that case, the defendant was a licensed timber buyer and was charged with forgery, committing a fraudulent act in the cutting and purchase of timber, obstruction of justice, and willfully failing to pay for timber as agreed. The defendant filed a motion to suppress evidence and quash arrest.

¶ 32 At the suppression hearing, a conservation police officer testified that an individual reported that some of his trees had been cut down without his permission. The officer determined that a company for which the defendant was a licensed buyer had cut the trees. The officer waited until after the defendant was required to pay a timber harvest tax to continue the investigation. The officer admitted that prior to the administrative search, she had enough evidence that the defendant had committed a felony. *Nash*, 278 Ill. App. 3d at 158-59.

¶ 33 The officer did not have a warrant for the search. The officer, accompanied by a second officer, seized all of the defendant's timber buying records for 1992 and 1993. The second officer "informed [the defendant] that she was to provide certain information in accordance with State law and that, if she did not provide that information, she might be guilty of obstruction of justice." *Nash*, 278 Ill. App. 3d at 159. The defendant testified that she did not believe she had a choice in the search. *Nash*, 278 Ill. App. 3d at 160. The trial court granted the motion, finding that "the officers conducted the warrantless search as part of an ongoing criminal investigation." *Nash*, 278 Ill. App. 3d at 160.

¶ 34 On appeal, the State argued that a search warrant was not required because section 9 of the Timber Buyers Licensing Act (225 ILCS 735/9 (West 1994)) allowed for warrantless searches and "the purpose of the search in this case was to ascertain if defendant had in fact violated the Act." *Nash*, 278 Ill. App. 3d at 160. The reviewing court relied on the decision in *Prolerized*, though it noted that the relevant statute in that case had a warrant requirement that was not required in the statute at issue. *Nash*, 278 Ill. App. 3d at 161. "Section 9 of the Timber Buyers Licensing Act authorizes the Department of Conservation to conduct administrative searches of timber buyers' records, and no warrant requirement is specifically set forth in the statute. This does not mean, however, that timber buyers do not come under the protections of the fourth amendment." *Nash*, 278 Ill. App. 3d at 161.

"Our concern is not the unannounced search authorized by section 9, a routine administrative inspection to monitor the accuracy of timber-buyer records. In this case we are not called upon to question the legislative authorization of warrantless searches in a routine inspection. Our concern is a search conducted under the auspices of section 9 to further an admittedly ongoing criminal investigation.

The State perceives no difference between the two searches. It argues that because the statute allows searches for the purpose of investigating whether criminal conduct is occurring, the officer's knowledge that criminal conduct has already occurred does not negate the authority the officer otherwise clearly had. We do not agree.

The privacy interests of timber buyers may be limited by the statutorily authorized search of records to routinely ascertain whether violations of the Act have been committed. The routine administrative search evolves into an unreasonable usurpation of the timber buyer's privacy interests when it is used as a tool to further a criminal investigation where evidence of criminal activity is already present." *Nash*, 278 Ill. App. 3d at 162.

¶ 35　　Here, defendant's privacy interests were violated where the audit was used as a tool to further a criminal investigation. TrustSolutions was aware that a criminal investigation was ongoing and was in communication with law enforcement before, during, and after the audit. Documents taken during TrustSolutions warrantless search were turned over to law enforcement. Additionally, the scope of documents taken exceeded the stated purpose of investigating Medicare billing practices. The stated objective of the audit was to substantiate the allegations with the intention to turn over evidence to law enforcement. When all the evidence is considered, the record supports a conclusion that the audit served as a pretext for law enforcement to obtain documents to further its criminal investigation. Accordingly, the trial court's finding that the audit was a pretext and that a search warrant should have been obtained was not against the manifest weight of the evidence.

¶ 36　　However, even if the audit was not a pretext for the criminal investigation, the record does not support the State's assertion that defendant consented to the audit.

¶ 37　　"[A] search conducted with a defendant's voluntary consent but without a warrant does not violate the fourth amendment." *People v. Anthony*, 198 Ill. 2d 194, 202 (2001) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973)). "The validity of a consent search depends on the voluntariness of the consent." *Id.* "Consent is not valid unless it is voluntary, and, to be voluntary, consent must be given freely without duress or coercion (either express or implied)." *People v. Green*, 358 Ill. App. 3d 456, 462-63 (2005). "Consent must be received, not extracted 'by explicit or implicit means, by implied threat or covert force.' " *Anthony*, 198 Ill. 2d at 202 (quoting *Schneckloth*, 412 U.S. at 228). "The voluntariness of the consent is a question of fact determined from the totality of the circumstances, and the State bears the burden of proving the consent was truly voluntary." *Id.* The Illinois Supreme Court has "acknowledged that 'there is little authority as to what constitutes consent in the absence of an express verbal statement.' " *Id.* (quoting *People v. Henderson*, 142 Ill. 2d 258, 298 (1990)). "The defendant may convey consent to search by nonverbal conduct [citations], but 'mere acquiescence to apparent authority is not necessarily consent' (*People v. Kelly*, 76 Ill. App. 3d 80, 87 (1979))." *Id.* "In the case of nonverbal conduct, where dueling inferences so easily arise from a single ambiguous gesture, the defendant's intention to surrender this valuable constitutional right should be unmistakably clear." *Id.* at 203.

¶ 38　　Here, the State has failed to satisfy its burden that defendant consented to the search. The only evidence of verbal consent in the record comes from Poirier's testimony. Poirier stated that he spoke with defendant over the phone and defendant "gave authorization" for the audit. The only details as to this verbal consent from defendant was described as follows: Poirier "notified [defendant] of what the on-site audit would entail, provided that [Poirier] had indicated the letter to Janice Roe and [defendant] said okay." Defendant's response of "okay" is ambiguous and does not demonstrate consent. Poirier never testified that he asked defendant for consent. In fact, when asked if he told the employees that they could refuse access, Poirier responded that "[n]o one asked so I didn't volunteer a question that wasn't posed." Poirier's testimony failed to describe any request for consent to perform the audit. The burden is on the State to establish consent to a warrantless search.

¶ 39　　The State also asserts that defendant consented because he allowed the auditors into his offices, provided them work space, and gave them whatever records they requested. This conduct does not demonstrate consent, but acquiescence to the requests from an authority figure. See *Anthony*, 198 Ill. 2d at 203 (There, the supreme court concluded that the State failed

to establish that the defendant voluntarily consented to a search of his person. The officers called to the defendant from 50 feet away in an alley; the defendant waited for the officers. During the conversation, the defendant appeared nervous and put his hands in his pockets, which the officers then asked him to refrain from doing. When asked if the defendant would allow the officers to search him, "[t]he defendant then 'assumed the position' of an arrestee: he 'spread his legs apart and put his hands on top of his head.' "). Moreover, even if defendant initially consented to the audit of his Medicare payment records, which we do not find, the audit exceeded the initial request when the auditors obtained personnel and payroll records and appointment books without consent.

¶ 40    Additionally, the State contends in its opening brief that defendant consented to the search when he entered into a contract with Medicare. However, in its reply brief, the State does not offer any additional argument on this issue or even mention this as a basis for reversal. It is unclear if the State continues to advance this claim. Regardless, we find this argument lacks merit.

¶ 41    The Medicare contract at issue does not contain any provisions that indicate consent to a search as broad as the one at issue. Rather, the contract simply provides that defendant "agree[d] to abide by the Medicare laws, regulations and program instructions that apply" to him and that payment of a claim by Medicare was conditioned on its compliance with "such laws, regulations, and program instructions." While Medicare Integrity Program does allow for payment audits (42 U.S.C. § 1395ddd(f)(7) (2006)), the State has conceded that this statute does not serve as a substitute for a warrant under the administrative search exception. The statute does not provide any details about how an audit would be conducted.

¶ 42    The State relies on two cases to support this argument, *Marcowitz v. Department of Public Health*, 106 Ill. App. 3d 422 (1982), and *United States v. Brown*, 763 F.2d 984 (8th Cir. 1985). We note that both of these cases were decided prior to the Supreme Court's decision in *Burger*, which set forth the criteria for a warrantless inspection. The *Burger* test provides: (1) there must be a substantial government interest that informs the regulatory scheme pursuant to which the inspection is made; (2) the warrantless inspections must be necessary to further the regulatory scheme; and (3) the statute's inspection program, in terms of the certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant, such that it provides that the search is being performed under the law, it has a properly defined scope, and it limits the discretion of the inspecting officers. *Burger*, 482 U.S. 702-03.

¶ 43    In *Marcowitz*, the plaintiff objected to the inspection of his medical facility and as a result, his license as an ambulatory surgical treatment center was suspended for 30 days. One of the issues raised on appeal was that the attempted inspection was an unreasonable invasion of his privacy rights. *Marcowitz*, 106 Ill. App. 3d at 426. The reviewing court found that the attempted inspections were reasonable because the plaintiff accepted the rules and regulations attached to the license, which included that every licensed facility " 'be open at all reasonable times to an inspection' " and prior notice of an inspection was not required. *Id.* at 428 (quoting Ill. Rev. Stat. 1979, ch. 111½, ¶ 157-8.9). The court concluded that "the attempted inspections of plaintiffs' surgical facility were reasonable and constitutionally permissible, based on plaintiffs' statutory consent to such inspections and the State's police power to protect the well-being of its citizens." *Id.*

¶ 44    In *Brown*, the defendants appealed their convictions for filing false claims for payment to the Medicaid program. There, the defendants challenged the warrantless search of a pharmacy.

- 10 -

However, the Arkansas Medicaid statute required providers to give written consent to warrantless administrative searches of "all records for the purpose of investigating whether any person may have committed the crime of Medicaid fraud, or for use or for potential use in any legal, administrative or judicial proceeding." *Brown*, 763 F.2d at 988. The reviewing court found that the defendants had constructive, if not actual, knowledge of the statute and the policies when they entered into a contract to be a Medicaid provider and, thus, they expressly consented to the search. *Id.* at 988-89.

¶ 45　　In contrast, defendant was not required to give written authorization of a search of his records for a criminal proceeding. Rather, he agreed to abide by the Medicare laws, regulations and policies, which included payment audits under the Medicare Integrity Program. However, the statute setting forth the payment audit did not authorize a blanket consent for a search to determine criminal wrongdoing and as previously noted, the State concedes that administrative search exception under *Burger* does not apply on this record. Accordingly, defendant did not consent to the TrustSolutions audit when he entered into the provider contract with Medicare.

¶ 46　　Accordingly, we find that the State failed to satisfy its burden that defendant consented to the warrantless search of his office records.

¶ 47　　Based on the foregoing reasons, we affirm the decision of the circuit court of Cook County.

¶ 48　　Affirmed.