2021 IL App (1st) 190026

SECOND DIVISION
December 28, 2021

1-19-0026

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 CR 2252 |
| | ) | |
| VALENTIN GARCIA, | ) | Honorable |
| | ) | Angela Munari Petrone, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE HOWSE delivered the judgment of the court, with opinion.
Justices McBride and Burke concurred in the judgment and opinion.

OPINION

¶ 1        Defendant Valentin Garcia was arrested in November 2017 and charged with gun-related offenses. He was released on electronic monitoring (EM) pending his trial on those charges. In February 2018, he was arrested and charged with two counts of escape for failing to comply with the conditions of the Cook County Sheriff's Electronic Monitoring Program. Following a bench trial, the trial court found defendant guilty of escape and sentenced him to two years' imprisonment. This sentence was consecutive to the one year sentence imposed pursuant to his guilty plea in the underlying gun case. In this direct appeal, Garcia contends that his trial counsel was ineffective because counsel did not file a motion to suppress evidence obtained from the search of his home. We affirm.

¶ 2                                         I. BACKGROUND

¶ 3        Defendant was charged with two counts of escape under section 4.1(a) of the Electronic Monitoring and Home Detention Law (730 ILCS 5/5-8A-4.1(a) (West 2016)). The indictment

alleged that defendant knowingly violated conditions of the Cook County Sheriff's EM program by being absent without leave from his home and removing his EM transmitter.

¶ 4     At trial, Investigator Frank Anson testified regarding defendant's participation in the sheriff's EM program. Anson worked in the EM unit administering the contracts for persons eligible for pretrial home detention. On November 16, 2017, Anson helped defendant enroll in the EM program. Anson explained the conditions stated on the participation agreement and equipment responsibility agreement. He identified those agreements in court. As a condition of participation, Garcia agreed "to admit representatives of this program into [his] residence twenty-four hours a day to ensure compliance with the conditions of the program." Garcia initialed the conditions and signed both agreements. Anson also gave Garcia handouts with phone numbers for the court branches, requesting movement outside the home, and assistance with EM equipment. Anson identified those handouts in court.

¶ 5     On cross-examination, Anson testified that he explained the conditions of the EM program to a group that included defendant and made clear they cannot be released on pretrial home detention without agreeing to the conditions of the EM program. He did not ask Garcia about his educational background or first language. The agreements were printed in English, but the handouts were printed in English and Spanish. After Garcia initialed and signed the participation and equipment responsibility agreements, Anson fitted a large EM band around defendant's ankle using a special pair of pliers. He conceded that someone could use regular pliers to remove the device.

¶ 6     Investigator Brian Shedor testified he and his partner, Investigator Vasquez, were assigned to investigate a device tampering alarm at Garcia's address on December 15, 2017. The person who answered the door on the first floor told them Garcia lived "around the back" and the

person who answered the door on the second floor said Garcia lived on the third floor. However, when he went to the third floor and knocked on the door, no one answered.

¶ 7    Then, according to Shedor,

"I went back down to the second floor and I guess his sister or other family member lives there *** went up there with me. The male relative knocked on the door and asked if anyone was there but no one answered. They opened the door and then I proceeded in there and then that's when I found the box and the band."

Shedor conceded he asked one of them to open the third floor door. Additionally, the serial numbers on the EM box and band that were found inside the apartment matched the serial numbers assigned to Garcia.

¶ 8    Shedor further testified that he wore a body camera that recorded his investigation. However, before the State played that footage, defense counsel asked the court to exclude any information about defendant given by the persons on the video. The court reserved ruling on defense counsel's objection and the State played the footage, which included dialogue in Spanish between defendant's sister and brother-in-law.

¶ 9    After the footage was played, the trial court sustained defense counsel's objection to "any hearsay statements made by anybody in the home." The court also sustained defense counsel's objection to any information that Shedor gleaned from an EM tracking program that he was shown using. Shedor then testified the clip on Garcia's EM band was broken.

¶ 10    On cross-examination, Shedor conceded he did not know how the clip was broken. He also stated that he activated his body camera when he arrived at Garcia's address after 7 p.m.

¶ 11    Investigator Wilson Reyes, who worked in the fugitive investigations unit, testified he arrested Garcia at his home on February 1, 2018. Garcia was not wearing an EM band at the

time. The State introduced certified statements of disposition in Garcia's underlying gun case, which showed Garcia entered the EM program in November 2017 and an arrest warrant was issued when he failed to appear in court on December 22, 2017.

¶ 12       The State rested its case in chief and defense counsel moved for a directed finding, arguing there was no indication Garcia understood the conditions of the EM program because Investigator Anson did not ask him about his educational background or first language. In denying the motion, the trial court noted that Garcia initialed and signed the participation and equipment responsibility agreements, there was no indication he did not understand the conditions of the EM program, and he never requested a Spanish interpreter throughout the proceedings.

¶ 13       Garcia testified that his first language is Spanish. He attended public school and was taught in bilingual classrooms. After completing the eighth grade, he attended high school but was kicked out because he was failing a lot of classes. When asked whether he understood the EM participation agreement that he signed, Garcia replied, "Honestly, I didn't—I read a lot of it but they told us to hurry up so we could go home. I just wanted to go home." Garcia testified he did not understand everything in the agreement but an officer answered a question he had.

¶ 14       Garcia testified that several days after the EM band was placed around his ankle, sheriff's deputies came to his home and replaced it because the clips would not close tightly. The band often fell off and each time he "just put it back on." He did not intentionally remove the band.

¶ 15       On cross-examination, Garcia acknowledged he was testifying in English and understood the questions being asked. When he enrolled in the EM program, he gave his home address for placement on pretrial home detention. According to Garcia, "my family lives there." His mother's name was on the apartment lease. The building had three floors. He lived on the third

floor, and his sister lived on the second floor with her husband, their four children, and another sister. Other people lived on the first floor.

¶ 16     Garcia identified the participation and equipment responsibility agreements that he had initialed and signed. The address he provided on the equipment responsibility agreement specified he lived in Apartment 3. After he signed the agreements, sheriff's deputies took him to his apartment and set up the EM box. He stayed home and only left when ordered to appear in court. Eventually, a warrant for his arrest was issued when he failed to appear in court on December 22, 2017.

¶ 17     Meanwhile, on Friday, December 15, 2017, Garcia's EM band fell off his ankle, but he did not put it back on. Instead, he went to a temp agency around 5 p.m. and was out for at least three hours. When he returned home, his EM band and box were gone. He knew investigators had removed the EM equipment and there would be a warrant issued for his arrest because he was on the phone with his sister when the investigators were at his apartment. He called a phone number on one of the EM handouts, but no one answered, and he did not appear in court on December 22, 2017, to explain there was a problem with his EM band.

¶ 18     Defense counsel called Investigator Shedor as a rebuttal witness. Shedor did not know whether the EM box that he recovered from Garcia's apartment was the original box assigned to Garcia.

¶ 19     Upon the State's request, the trial court admitted the footage from Investigator Shedor's body camera into evidence "for the nonverbal actions of the officer in going to the house and the lack of the defendant being there, [and] not for any statements that were made on the video." The court also admitted the EM participation and responsibility agreements that defendant signed.

¶ 20　　　　Following closing argument, the trial court found defendant guilty on both counts of escape. The court noted defendant initialed and signed the EM agreements, the investigators testified about defendant's placement in the EM program at his apartment on the third floor, and Investigator Shedor testified that defendant was not home when he knocked on his door in the evening on December 15, 2017. The court also noted the footage of Shedor's body camera showing his recovery of the EM equipment inside defendant's apartment but made clear it did not consider "any testimony of any statements of anybody in the house that defendant left." The court stated that defendant testified in English and responded to questioning without apparent confusion. Additionally, the court stated that, although no one saw defendant break the clip on his EM band, the inference is clear from the circumstantial evidence showing he was not home when the investigators went there to investigate a device tampering alarm.

¶ 21　　　　The trial court subsequently denied defendant's motion for a new trial. This appeal follows.

¶ 22　　　　　　　　　　　　　　　　　II. ANALYSIS

¶ 23　　　　On appeal, Garcia contends his trial counsel was ineffective for failing to file a motion to suppress evidence obtained from the search of his home. He argues that his brother-in-law did not have authority to consent to the search of his apartment, and without the evidence acquired from the search, the State could not prove him guilty beyond a reasonable doubt. Garcia asserts that a motion to suppress would have been meritorious and there was a reasonable probability that the trial outcome would have been different had the evidence been suppressed.

¶ 24　　　　The State argues that the issue of whether the brother-in-law's consent to search was valid is irrelevant because defendant consented to a warrantless search of his home by authorities when he entered the EM program.

¶ 25        A defendant has a constitutional right to effective assistance of counsel. U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8. To establish ineffective assistance of counsel, a defendant must show (1) counsel's representation fell below an objective standard of reasonableness and (2) the deficient performance prejudiced defendant. *People v. Veach*, 2017 IL 120649, ¶ 30; *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

¶ 26        A reviewing court need not apply this two-prong analysis in sequential order. *People v. Johnson*, 2020 IL App (1st) 172987, ¶ 41. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland*, 466 U.S. at 697; *People v. Hardy*, 2020 IL App (1st) 172485, ¶ 29 (plurality opinion) (partially quoting *Strickland*).

¶ 27        Because a defendant must satisfy both parts of the *Strickland* analysis to prevail, we need not reach the issue of prejudice if we find that counsel's performance was not deficient. *People v. Ramirez*, 2018 IL App (1st) 152125, ¶ 15 (citing *People v. Coleman*, 183 Ill. 2d 366, 397-98 (1998)). And it is elementary that "[a]n attorney's performance will not be deemed ineffective for failing to file a futile motion." *People v. Stewart*, 365 Ill. App. 3d 744, 750 (2006). "Defense counsel is not required to make losing motions or objections in order to provide effective legal assistance." *People v. Moore*, 2012 IL App (1st) 100857, ¶ 45; *People v. Mercado*, 397 Ill. App. 3d 622, 634 (2009). That is the case here because we find the consent issue raised by defendant has no merit.

¶ 28        Prospective Consent to Search as a Condition of Participation in the EM Program

¶ 29        The sheriff's EM program allows certain classes of pretrial and postsentence inmates to remain in the community instead of jail. *People v. Rogers*, 2012 IL App (1st) 102031, ¶ 34. The Electronic Monitoring and Home Detention Law governs EM programs. *Id.*; 730 ILCS 5/art. 8A

(West 2016). " 'Electronic monitoring' " means the monitoring of a person with an electronic device inside and outside of the home under the conditions established by the supervising authority. 730 ILCS 5/5-8A-2(A-20) (West 2016). " 'Home detention' " means the confinement of a person convicted or charged with an offense to the residence under the conditions established by the supervising authority. *Id.* § 5-8A-2(C). The sheriff may develop reasonable guidelines for the operation of its electronic home detention program. *Id.* § 5-8A-4. At minimum, participants shall stay home at all designated times and *shall admit* any agent of the supervising authority inside at any time for the purpose of verifying compliance with the conditions of home detention. *Id.* § 5-8A-4(A), (B).

¶ 30 A condition of defendant's participation in the EM program required him to "agree to *admit* representatives of this program into [his] residence twenty-four hours per day to ensure compliance with the conditions of this program." (Emphasis added.) Garcia asserts that his participation in the EM program only required him to affirmatively consent to the search of his home to remain in the EM program. Garcia argues that this condition gives him the option of consenting to a warrantless search or leaving the EM program. Garcia maintains that because he was not present at the time of the search, he did not have the opportunity to give his consent. Garcia argues that he did not waive his fourth amendment right to be free from unreasonable searches by agreeing to the condition.

¶ 31 The fourth amendment of the United States Constitution protects individuals against unreasonable searches and seizures. U.S. Const., amend. IV. "A 'search' occurs when 'an expectation of privacy that society is prepared to consider reasonable is infringed.' " *People v. Absher*, 242 Ill. 2d 77, 83 (2011) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)). Generally, law enforcement officers may not enter and search a person's home absent exigent

circumstances because the right to retreat into one's home without governmental interference is a fundamental principle of the fourth amendment. *Id.* A person's consent is an exception to the requirement of a search warrant. *Id.* (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973)). Put another way, " '[a] search conducted with a defendant's voluntary consent but without a warrant does not violate the fourth amendment.' " *People v. Won Kyu Lee*, 2014 IL App (1st) 130507, ¶ 37 (quoting *People v. Anthony*, 198 Ill. 2d 194, 202 (2001)). A person may also waive a constitutional right if the waiver is knowing, voluntary, and " 'done with sufficient awareness of the relevant circumstances and likely consequences.' " *People v. Liss*, 2012 IL App (2d) 101191, ¶ 15 (quoting *Brady v. United States*, 397 U.S. 742, 748 (1970)).

¶ 32   The State points out that the circumstances here involve a defendant who was placed on electronic monitoring pending trial. Garcia was neither a probationer nor a parolee as in the opinions addressing similar search conditions. Probation and mandatory supervised release do not occupy the same point on the "the 'continuum' of state-imposed punishments" (*People v. Wilson*, 228 Ill. 2d 35, 43-44 (2008) (quoting *Samson v. California*, 547 U.S. 843, 850 (2006))), but probationers and persons on mandatory supervised release are "similarly situated in the broad sense that both enjoy conditional liberty" (*People v. Moss*, 217 Ill. 2d 511, 522 (2005)). *People v. Galley*, 2021 IL App (4th) 180142, ¶¶ 24-25. Thus, our supreme court has recognized that " 'probationers and parolees share the same status for fourth amendment purposes.' " *Id.* ¶ 25 (quoting *Moss*, 217 Ill. 2d at 521-22).

¶ 33   Pretrial release on home detention and electronic monitoring might not occupy a point on the continuum of state-imposed punishments. See *People v. Smith*, 2014 IL App (3d) 130548, ¶ 19 (" '[A] defendant confined to his residence does not suffer the same surveillance and lack of privacy associated with becoming a member of an incarcerated population.' " (quoting *People v.*

*Ramos*, 138 Ill. 2d 152, 159 (1990))). The United States Supreme Court has recognized that loss of freedom of choice and privacy are inherent consequences of pretrial detention, but the fact such confinement "interferes with the detainee's understandable desire to live as comfortably as possible and with as little restraint as possible during confinement does not convert the conditions or restrictions of detention into 'punishment.' " *Bell v. Wolfish*, 441 U.S. 520, 537 (1979). As a person arrested on probable cause for gun-related offenses, Garcia has a reduced expectation of privacy and freedom from police scrutiny. See *Maryland v. King*, 569 U.S. 435, 463 (2013). Given the absence of authority on the interpretation of search conditions placed on pretrial releasees like Garcia, we turn to cases involving probationers and parolees with similar search conditions.

¶ 34    The Seventh Circuit Court of Appeals has determined that probationers can knowingly and intelligently give up their fourth amendment constitutional right to be free from unreasonable searches. See *United States v. Barnett*, 415 F.3d 690 (7th Cir. 2005). In *Barnett*, as a condition of probation, the defendant agreed to "submit to searches of [his] person, residence, papers, automobile and/or effects at any time such requests are made by the Probation Officer, and consent to the use of anything seized as evidence in Court proceedings." (Internal quotation marks omitted.) *Id.* at 691. The Seventh Circuit held that the defendant's agreement to the search condition knowingly and intelligently waived his expectation of privacy and, alone, justified the search of his residence. *Id.* at 691-92. The Seventh Circuit observed that constitutional rights can be waived provided the waiver is knowing and intelligent. *Id.* at 691.

"Nothing is more common than an individual's consenting to a search that would otherwise violate the Fourth Amendment, thinking that he will be better off than he

would be standing on his rights. Often a big part of the value of a right is what one can get in exchange for giving it up." *Id.* at 692.

Additionally, the Seventh Circuit explained that the purpose of the blanket waiver was not to allow probation officers to harass probationers, "but to excuse the officers from having to justify a search by establishing that it was based on probable cause, suspicion, or some other standard that might invite litigation." *Id.*

¶ 35     The State asserts that our supreme court's reasoning in *Absher*, 242 Ill. 2d 77, is instructive and necessitates finding that Garcia gave prospective consent to search his home based on such condition of his participation in the sheriff's EM program. We agree.

¶ 36     In *Absher*, 242 Ill. 2d at 90-91, our supreme court found that the defendant waived his fourth amendment rights by freely agreeing to the suspicionless search condition in his probation order and held the defendant's agreement constituted prospective consent. In doing so, our supreme court adopted the reasoning of the Seventh Circuit in *Barnett*, 415 F.3d 690.

¶ 37     The parties recognize that, unlike in *Absher*, Garcia did not enter a negotiated plea. However, the State maintains that defendant entered a contract when he voluntarily signed the "Cook County Sheriff's Office Participant Contract" and received the benefit of staying home on electronic monitoring pending his trial. Meanwhile, Garcia concedes he "might have signed a 'contract' before he could be released," but he claims the choice between pretrial incarceration or electronic monitoring at home was "so oppressive it was no choice at all." We are mindful that the *Absher* court limited its holding—that the defendant's agreement to the suspicionless search condition in his probation order constituted prospective consent—to the facts of the case. See *Absher*, 242 Ill. 2d at 91 n.4. Nevertheless, we are persuaded by the *Absher* court's reasoning as applied to the facts in this case, and we reach a similar determination about Garcia's agreement

"to admit representatives of this program into [his] residence twenty-four hours per day to ensure compliance with the conditions of this program."

¶ 38    The *Absher* court noted that the Seventh Circuit's application of contract principles is consistent with Illinois precedent. *Id.* at 86-88 (citing *People v. Evans*, 174 Ill. 2d 320 (1996)). Applying contract principles, the *Absher* court observed that the defendant negotiated with the State for its recommendation of two years' probation, with the first year being " 'intensive.' " *Id.* at 88. Furthermore, the defendant's probation order stated he agreed to obey and comply with the rules of intensive probation supervision, including that he " 'submit to searches of your person, residence, papers, automobile and/or effects at any time such requests are made by the Probation Officer, and consent to the use of anything seized as evidence in Court proceedings.' " *Id.* at 79. "Faced with the possibility of imprisonment and a complete loss of freedom and privacy rights, defendant opted to avoid incarceration and agree to probation, including a year of the more restrictive 'intensive' version and its greater invasion of privacy." *Id.* at 88. There was no dispute that the agreement was explained to the defendant, he understood its provisions, and he freely signed the form. *Id.*

¶ 39    The *Absher* court distinguished the defendant's search condition from that in *People v. Lampitok*, where the probationer was subject to a probation order stating that she " 'shall submit to a search of her person, residence, or automobile at any time as directed by her Probation Officer to verify compliance with the conditions of this Probation Order.' " *Id.* at 89 (quoting *People v. Lampitok*, 207 Ill. 2d 231, 236 (2003)). In that case, our supreme court held that the search condition affirmatively required probation officers to obtain the probationer's consent to a search limited to verifying her compliance with probation conditions. *Lampitok*, 207 Ill. 2d at 262. By contrast, the *Absher* court noted that the language used in Absher's probation order was

more restrictive in that Absher agreed to obey and comply with *any* search and consent to the use of anything seized during the search as evidence in court proceedings. *Absher*, 242 Ill. 2d at 90. The *Absher* court also noted that the defendant in *Lampitok* was not the probationer subject to the search condition. *Id.* Lampitok occupied a motel room with the probationer at the time probation officers searched the room, and he was arrested after the officers found drugs and weapons. *Id.* (citing *Lampitok*, 207 Ill. 2d at 235-37). On the facts presented, the *Absher* court held that the defendant's agreement to the suspicionless search condition constituted prospective consent. *Id.* at 90-91.

¶ 40    Applying the reasoning in *Absher* to the facts here, we find that Garcia gave prospective consent to search his home based on such condition of his participation in the sheriff's EM program. Parties to a contract "may waive constitutional or statutory rights or may change an established rule of law." *Steen v. Modern Woodmen of America*, 296 Ill. 104, 118 (1920); accord *Szafranski v. Dunston*, 2013 IL App (1st) 122975, ¶ 44 ("individuals may waive their constitutional rights, whether by contract or otherwise"). Even Garcia acknowledges in his reply brief that he "might have signed a 'contract' before he could be released." Although he claims that the choice between pretrial incarceration and electronic monitoring at home was "so oppressive it was no choice at all," we note that "a probationer's waiver of his fourth amendment rights is no less voluntary than the waiver of rights by a defendant who pleads guilty to gain the benefits of a plea bargain." *People v. Eiland*, 217 Ill. App. 3d 250, 258 (1991); see also *Barnett*, 415 F.3d at 692 ("Nothing in the Fourth Amendment's language, background, or purpose would have justified forcing Barnett to serve a prison sentence rather than to experience the lesser restraint of probation.").

¶ 41　　　　Critically, the language used in Garcia's EM participation agreement is distinguishable from that in *Lampitok* when considered in the context of the record before us. Garcia was arrested and charged with gun-related offenses. He then signed an EM participation agreement stating he agreed "to admit representatives of this program into [his] residence twenty-four hours per day to ensure compliance with the conditions of this program." At that time, Garcia gave prospective consent to search his residence at any time to ensure his compliance with the program. In exchange for his agreement, Garcia was released from jail and allowed to stay home on electronic monitoring pending his trial. The language of Garcia's search condition cannot be construed to require officers to ask for consent when it is presumed that Garcia would be home to admit officers inside to verify his compliance with the program.

¶ 42　　　　In this case, investigators received an alarm that the home monitoring device worn by defendant as a condition of pretrial release had been tampered with. This provided a reasonable suspicion to investigate. Although under the terms of the program defendant was required to be at home when officers went to his home to investigate, he did not answer the door. Armed with this information, there was certainly probable cause to search defendant's residence. Defendant's brother-in-law opened the door for officers, who then confirmed defendant was in violation of the terms of the program. Based on Garcia's prospective consent, which he voluntarily gave in exchange for his release on home detention and electronic monitoring, a motion to suppress would have been meritless. "A court will not find that defense counsel was ineffective for failing to file a meritless motion to suppress." *People v. McIntosh*, 2020 IL App (5th) 170068, ¶ 54. Because Garcia failed to establish trial counsel's deficient performance, his claim of ineffective assistance fails. *People v. Clendenin*, 238 Ill. 2d 302, 317-18 (2010). Because we have found that

defendant gave his prospective consent to the search in this case, we need not consider whether authority existed for defendant's brother-in-law to consent to search his apartment.

¶ 43                                      III. CONCLUSION

¶ 44          Accordingly, we affirm defendant's conviction and sentence.

¶ 45          Affirmed.

---

**No. 1-19-0026**

---

| | |
|---|---|
| **Cite as:** | *People v. Garcia*, 2021 IL App (1st) 190026 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 18-CR-2252; the Hon. Angela Munari Petrone, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Anna C. Carlozzi, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Brian A. Levitsky, and Tasha-Marie Kelly, Assistant State's Attorneys, of counsel), for the People. |

---